Filed 10/6/14  Stefanie K. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| STEFANIE K.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SONOMA COUNTY,<br><br>     Respondent;<br><br>SONOMA COUNTY HUMAN SERVICES DEPARTMENT et al.,<br><br>     Real Parties in Interest. | A142305<br><br>(Sonoma County Super. Ct. Nos. DEP-4193 & DEP-4194) |

In this juvenile writ proceeding, Stefanie K. (mother) seeks extraordinary relief from the juvenile court order terminating reunification services with respect to her two sons—D. K. (born February 2010) and M. K. (born October 2011)—and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Specifically, mother claims that the juvenile court erred in concluding that there was no substantial probability that the boys could be returned to her care by the 12-month review date if reunification services were continued.  Mother further contends that the juvenile court should have exercised its discretion to continue services for this "sibling group" as permitted by section 366.21, subdivision (e).  Finally, mother argues that the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.  All rule references are to the California Rules of Court.

1

juvenile court's finding that she received reasonable reunification services was not supported by substantial evidence. Seeing no error requiring reversal of the juvenile court's setting order, we deny the petition.

## I. BACKGROUND

The Sonoma County Human Services Department (Department) became involved with D.K. and M.K. in early 2013 due to ongoing incidents of domestic violence between their parents.[2] First, on March 11, 2013, the police intervened after a loud verbal altercation between mother and father. When father disclosed that he had been diagnosed as bipolar and borderline schizophrenic and had not been taking his psychotropic medications, he was placed on an involuntary psychiatric hold pursuant to section 5150 as a danger to himself and others.[3] Then, on March 21, 2013, the police responded after mother and father got into an argument while driving in a car with M.K. Reportedly, father began to drive recklessly; made verbal threats, indicating that he was going to send mother through the windshield; prevented mother from calling 911 by throwing her phone against the car window; and, when mother opened the door in an attempt to escape, pushed her out of the slow-moving vehicle. Two hours later, the police were again called after father brandished a knife in mother's face while holding M.K. and then dragged mother into their bedroom against her will. As a result of these incidents, father was arrested on a host of charges, including assault with a deadly weapon not a firearm (Pen. Code, § 245, subd. (a)(1)), false imprisonment (Pen. Code, § 236), spousal battery (Pen. Code, § 243, subd. (e)(1)), cruelty to a child with possible injury or death (Pen. Code, § 273a, subd. (b)), preventing or dissuading a victim from making a police report

---

[2] Mother and Clifford K. (father) have been together for eight years and were married in March 2011. Clifford was declared the presumed father of the minors at the initial hearing in these matters on May 20, 2013. He has not contested the juvenile court's setting order, however, and is therefore not a party to these proceedings.

[3] Pursuant to subdivision (a) of section 5150, "[w]hen a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . or professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention . . . ."

(Pen. Code, § 136.1, subd. (b)(1)), and brandishing a weapon (Pen. Code, § 417, subd. (a)(1)). He was ultimately convicted on the spousal battery charge.

Upon meeting with the Department, mother indicated that she and father "had been on and off meth before" and that she thought father might be "shooting up" methamphetamine given his bizarre behavior. She agreed to a safety plan keeping father out of the home and away from the children for a period of two weeks. Later, mother reported that father had stayed away for the required period of time and that things had been stable since his return. Both parents were agreeable to counseling, but were not interested in other services or a formal dependency case.

Nevertheless, because the perceived risk to the minors was high according to the Department's assessment tool, the Department concluded that an in-home dependency action was warranted. As a result, on May 16, 2013, it filed a petition with respect to M.K. pursuant to subdivisions (a) and (b) of section 300. A similar petition was filed the same day with respect to D.K. pursuant to subdivision (b) only, as D.K. had not been directly in the zone of danger during the March 21 altercations. At the initial appearance on May 20, 2013, the matters were continued to June 19. During this continued hearing, the parents contested the Department's recommendation that family maintenance cases be established for the minors, and, after a July 24 settlement conference failed to resolve the dispute, the matters were set for a contested jurisdictional and dispositional hearing on August 23, 2013.

In its dispositional report filed on June 17, 2013, the Department documented the previous child welfare history of both parents when they were children. Specifically, the Department had received five referrals between 1997 and 2005 naming mother as a victim of general neglect, emotional abuse, and physical abuse. Father, for his part, had been a juvenile court dependent from 1996 through 2002, when he became a juvenile court ward. By his own report, he had "an extremely troubled and dysfunctional childhood." Since mother and father had themselves become parents (and prior to the referrals which formed the basis for these proceedings), the Department had received four referrals for suspected substance abuse and general neglect involving one or both of the

3

minors. Each of these previous referrals was either closed as unfounded or evaluated out without investigation.

When interviewed by the social worker for the dispositional report, mother downplayed her substance abuse history, indicating that she has never been an "addict" and that she had been clean and sober for 18 months. Father asserted that his sobriety was important to him and that—since he had been clean—he hadn't been fighting with mother, was able to work, and had energy to play with the minors. Neither parent, however, showed up for drug testing as requested by the Department on June 12, 2013. Moreover, although she claimed she would "do anything" for her children, mother also maintained: "If you people (referring to the Department) expect me to attend appointments or go to counseling or to classes that's just not going to happen. I don't do appointments. That's just a set up for me to fail."

The social worker's report also detailed concerns about possible speech delays or autism for three-year-old D.K., who was not expressing himself verbally and who had been observed banging his head against the floor and on a door. M.K. also was presenting with some worrisome behavioral issues, such as screaming, extremely loud and persistent whining, and throwing his head back towards the parent trying to restrain him. The social worker expressed concern about mother and father's failure to drug test as well as their minimization and apparent lack of concern regarding the boys' behavioral deficits. Overall, she found the home to be "at the very low end of marginal."

Then, on August 20, 2013, while proceedings with respect to the initial petitions were still pending, the police detained both minors after they discovered D.K. running down the middle of the street—naked, crying, and without supervision—in the early hours of the morning. Once the residence of the minor was identified, the officers learned that D.K. had been being supervised by a 15-year old babysitter, who was sleeping with both boys on a mattress in the living room. Mother, who was also present in the house, indicated that D.K. might have gotten outside through the doggy door or through a side door that they leave unlocked for the maternal step-grandmother, who lives in the home and is cognitively impaired. A maternal aunt—who lives in a converted

4

shed behind the house—indicated that the boys sometimes exit the residence undetected through the doggy door and that mother does not adequately supervise the minors, frequently leaving them for days at a time without food or diapers and with adults that are unknown to them. In fact, the maternal step-grandmother had reportedly been sexually assaulted by one of the transients invited into the home.

The maternal aunt also disclosed that she believed mother had been using methamphetamine for a number of years, that mother prostitutes herself, that people come and go from the residence at all hours, that these individuals often yell and fight with mother in front of the children, and that she had witnessed a male guest smoking methamphetamine in the bathroom about four months ago. A neighbor confirmed that there was frequent yelling at the residence—with numerous people coming and going throughout the night—and also reported removing D.K. and M.K. (both naked) from the middle of street about two weeks prior to the current incident. When the neighbor told mother about the children being in the street, mother reportedly seemed more annoyed than concerned.

Further, during the investigation, the officers assessed the home as unsafe and unsanitary, with exposed metal tack strips containing metal spikes; a filthy, stained hardwood floor in the living room, with animal vomit near and under the mattress; exposed outlets; garbage on the kitchen and living room floors; and, in the kitchen, filthy countertops, dirty pots and pans in the sink, food on the stove and countertops, and spoiled food in the refrigerator. Other than the mattress, there was no furniture in the living room. Nor were there any toys or other items designed to educate, entertain, or comfort toddlers. In addition, M.K.'s feet and face were dirty, and there was dried food on his clothes. D.K. was similarly filthy and looked as if he had not been bathed for days. Both boys appeared to have rashes on their bottoms.

When D.K. and M.K. were placed in protective custody, mother had no extra clothing or baby wipes to send with the children, claiming that all of their clothing was in her car which was missing. Neither child cried upon being removed from their mother. Further, while being supervised at the Department after their removal, both boys

5

presented with a flat affect and were generally unresponsive to a social worker's attempts to engage them.

The family's social worker spoke with mother by telephone the next day. During this conversation, mother stated that she had been clean and sober for almost a year, but again refused to drug test. Further, although the maternal aunt reported that mother had gone to detox the previous evening, mother denied this, stating that she was at work and that "her sister must be 'mistaken.' " At that time, the Department was also aware of an additional referral, which it had received on August 14, 2013, alleging general neglect of the minors. According to the reporting party, the carpet in the family home was urine soaked, both children were dirty and unclothed, the teenaged babysitter called the minors "brats," and the boys were out of control and climbing on unsafe furniture. The maternal aunt also relayed that the boys lived in a chaotic environment, with no set bedtime, poor nutrition, and "no fixed, or even remotely fixed," eating schedules. She additionally reported that she had seen the boys urinate on the carpet as they rarely wore clothing or diapers. Finally, the Department had received an evaluation of D.K. which found him to be behind in fine and gross motor skills, communication, and "all other areas."

As a result of all of this new information, the Department filed amended petitions on August 22, 2013, for both D.K. and M.K., adding additional allegations under section 300, subdivision (b), and including a section 300, subdivision (g), claim based on father's unavailability due to his incarceration.[4] The detention hearing with respect to the amended petitions was continued to August 26, 2013, on which date the minors were formally detained in foster care.

In its amended dispositional report filed with the court on September 16, 2013, the Department reported that mother was now claiming that she had not used drugs for the last three years. Similarly, father asserted from jail that no one at the residence was using drugs and that the boys were never left with anyone but family. In contrast, the maternal aunt informed the social worker that mother had been using methamphetamine "for

---

[4] Reportedly, father was in custody serving a six-month sentence related to his spousal battery conviction and had an expected release date of October 31, 2013.

6

years" and that "smoking meth has become her life now." Indeed, the maternal aunt revealed that she saw mother using a glass pipe packed with a "white, rocky powder" in her bedroom on the day the minors were detained. In addition, the maternal grandfather stated that he " 'truly' believes" mother is using drugs, adding that he had heard her brag that she can "beat" drug tests. The maternal grandfather further related that there is a "constant procession" of people babysitting the boys and that, when he visited the house on August 22, 2013, he observed garbage piled in the shower along with wet, mildewed clothes. He asked mother to leave the family home (which he owns) by October 1, 2013.[5] Finally, the paternal grandmother reported that she had been unsuccessful in helping mother and father get clean and sober.

With respect to the minors, D.K. had been quarantined from other children since his detention after being diagnosed with untreated impetigo, an infectious skin condition. He was observed by placement staff to exhibit a number of troubling behaviors, including head banging, intentionally running into walls and doors, bolting from staff, throwing objects, aggression, resistance to teeth and hair brushing, difficulty keeping clothes on, and significant language delays. The social worker was attempting to obtain developmental services through the school district for D.K. and was also seeking an assessment and services through North Bay Regional Center. As for M.K., his caregivers reported seeing more than four puncture wounds on each of his feet and one on his left forearm when he was placed with them, a situation consistent with the toddler stepping and/or falling on the nails sticking up from the living room floor.

The Department recommended family reunification services to deal with the parents' domestic violence issues, suspected substance abuse, and neglect of the minors. After a number of continuances, a combined jurisdictional and dispositional hearing was held on October 23, 2013. At that time, both parents submitted the matter, and the juvenile court found the minors to be described by section 300, declared them juvenile

---

[5] Interestingly, according to the paternal grandfather on September 6, mother claimed that the social worker had apologized to her and that the Department would return the minors to her care if she wasn't losing her housing.

7

court dependants, and removed them from the custody of their parents. Thereafter, the court ordered both parents to comply with their proposed reunification case plans. For mother, this included: (1) maintaining a safe and stable home, including no safety hazards, 911 calls, or arrests at the home; (2) participation in a drug treatment assessment and follow-through with treatment recommendations; (3) completion of a psychological evaluation; (4) compliance with random drug testing; (5) cooperation with the Department, including consistent contact; and (6) weekly therapy.

The juvenile court held an informal three-month review on January 23, 2104. At that time, the Department reported being "very concerned" about the lack of participation in services by both parents. Moreover, although the minors were improving every day, given their behaviors, the social worker inferred that they had not been taught language and had not been exposed to many children or age-appropriate toys prior to their detention. Unfortunately, by the time of the six-month review, the parents' compliance with their case plans continued to be substandard. Thus, it was the recommendation of the Department that reunification services for both parents be terminated.

Focusing on mother—although her case plan required that she maintain a safe home and that no arrests take place there—a deputy sheriff attempted to serve an arrest warrant for father at the residence on December 14, 2013. At that time, mother claimed to be father's sister and stated that she did not know where he was, even though father was in the garage with her. After refusing to allow law enforcement into the garage and lying about father's whereabouts, she was arrested for delaying the investigation. In the meantime, father escaped through the back of the garage and jumped two fences in an attempt to get away. Ultimately, he was tackled by a deputy sheriff and also arrested.[6]

---

[6] Mother had an additional contact with law enforcement on March 5, 2014, after the vehicle she was driving was identified as containing three suspects who had fled the scene after brandishing a knife at several people. Mother was present at the arrest of one of the suspects and admitted that the knife was hers, claiming that she was trying to remove it from the arrestee's house so that he would not be in violation of his probation. Then, on April 3, 2014, mother was again at the scene of an arrest after three bags of methamphetamine, a glass pipe, and a scale were found under the seat of the vehicle she

Further, although mother had completed an initial phone call with the Drug Abuse Alternative Center (DAAC) regarding the substance abuse assessment required by her reunification plan, she failed to participate in four subsequent attempts by DAAC to complete the assessment on October 12, November 12, November 14, and December 19. She was again referred to DAAC on January 24, 2014, and scheduled for an assessment on February 3, 2014. However, mother also failed to attend the February 3 assessment. In fact, it was not until April 9, 2014, that she actually made an appointment, got there, and began working on her treatment. And, even then—since mother told DAAC that she just needed a "quick assessment" and that she did not have a substance problem—mother was not referred to the full scope of available services. Rather, she was in a recovery group that the social worker believed was "a little bit too many steps ahead" for her as she wasn't even drug testing and could not admit to her addiction.

Indeed, mother's sporadic drug testing record was of significant concern. As of the contested six-month review on June 24, 2014, mother had missed 16 drug tests, with only five clean tests. Moreover, at a drug test on May 16, 2014, she failed to produce a sufficient amount of urine for testing. Thus, although that test came back positive for amphetamines, the result could not be confirmed due to the small sample size. The testing laboratory expressed concern that mother was tampering with her test results as she appeared to be under the influence of substances. And, in fact, on May 28, 2014, the Department received a report that mother was purchasing urine from a 12-year-old girl.

In addition, although mother had begun her required weekly therapy in October 2013, she was discharged by her therapist after missing three appointments in January. In particular, the therapist reported that mother failed to show for her January 8 appointment after the therapist had expressly confirmed with mother on January 7. When the therapist called mother on January 8, mother claimed not to remember speaking with her the day before. Moreover, the therapist reported that—when mother did attend therapy—she

was driving. Mother claimed she had borrowed the truck from someone she didn't know in order to move. However, it was almost midnight at the time of the arrest, and the truck's owner had been with her at the previous incident in March.

9

used the time to complain about the Department and other services providers rather than working on her therapeutic goals. In sum, mother was not able to take responsibility for her part in the case or for the minors' circumstances, placing blame on everyone else.[7]

Mother was also required to complete a psychological evaluation as part of her reunification plan, but failed to do so. Although the social worker reviewed this requirement with her on a monthly basis, mother said she did not want to be "labeled" and further claimed that " 'the judge told me I did not have to do what the case plan says.' "

Mother also ran afoul of the reunification mandate that she demonstrate cooperative behaviors with the Department and other professionals working with her family. Reportedly, mother hung up on her social worker on multiple occasions, yelled and used profanity during monthly meetings, and attempted to record the social worker without permission. Additionally, mother missed meetings with the social worker on May 22, June 2, and June 5, 2014. And, although mother was told that an Individualized Education Plan (IEP) meeting was being held for D.K. on May 15, 2014, and that her signature was necessary to move forward with services for her son, she failed to attend.

At the beginning of the reunification period, visitation was initially suspended because it was unclear whether mother had a methicillin-resistant staphylococcus aureus (MRSA) infection or impetigo (both boys had MSRA and D.K. had impetigo). Once she was cleared on November 11, 2013, however, mother had reasonably consistent weekly supervised visitation with D.K. and M.K, missing nine visits out of thirty-one. In addition, mother did work with a parent educator during the reunification period who reported that, while mother appeared to try, the children were "difficult to control." After 22 sessions with mother, the parent educator stated that she felt there was no more she could do for her, because mother was too angry at the Department and other parts of her

---

[7] The social worker referred mother to a new therapist on March 5, 2014, who she was seeing at the time of the six-month review. According to this new therapist, mother was attending consistently and making progress in treatment. However, even she agreed that it would take mother a "period of years" to work on her issues.

life to engage in, and benefit from, services. Further, when the parent educator was not present at visits, mother was unable to demonstrate that she had improved her parenting skills. It was noticed, for instance, that mother appeared to over-stimulate the minors during visits and failed to intervene during their negative behaviors. In fact, shortly before the June 2014 six-month review, mother's hour long supervised visitation was split in half so that she could spend 30 minutes alone with each minor, as she was unable to contain both children safely at the same time.

Finally, although D.K. and M.K. were significantly behind in fine motor, gross motor, communication, and social/emotional skills when they were initially detained, they had both made substantial progress while in foster care. According to the social worker, the "number one reason" the boys were improving was that they were receiving consistent, "24/7" care and attention from their foster parents, where they had access to a myriad of community services. There was still, however, much to be done. At the time of the six-month review, D.K. had recently undergone a serious dental surgery due to multiple cavities and neglected dental hygiene. Further, given his speech delays, he could not yet be assessed regarding his mental health needs. M.K. continued to hoard toys and, although he was three years old, was still testing at 16 months for adaptive behaviors and 14 months for social/emotional skills. Although he was too young to be assessed for mental health issues, he displayed behaviors that caused concern to the Department. In the social worker's expert opinion, neglect played a "significant role" in the minors' developmental issues. D.K.'s speech therapist similarly opined that the boy's delays were not organic. Nevertheless, mother continued to maintain that there was "nothing wrong with the children before [their detention]; that they didn't have any issues before; that she addressed everything they needed; that they were always talking."

At the conclusion of the contested six-month review hearing, the juvenile court terminated reunification services and scheduled a permanency planning hearing for October 16, 2014. In reaching its decision to terminate services, the juvenile court expressly found that both parents had failed to regularly participate and make substantive progress in their cases plans. With respect to mother, the court specifically stated: "I do

concur, first off, with the analysis by the Department that there has been clear and convincing evidence for this Court to find that mother has met neither of those prongs based upon the numerous law enforcement contacts, the repeated failures to participate in the DAAC referrals, the repeated missed therapy, along with being discharged from the therapy by the original therapist. The missed drug tests I think alone are sufficient." The court went on to conclude that there was no substantial probability that, with continued services, the minors could be returned to their parents by the 12-month permanency hearing.

Mother subsequently filed a timely notice of her intent to file a writ petition, and the petition itself was filed on August 29, 2014. (Rules 8.450(e), 8.452.)

## II.  TERMINATION OF REUNIFICATION SERVICES

In the present case, M.K. was under three years of age when he was removed from the physical custody of his parents on August 20, 2013. Pursuant to section 361.5, subdivision (a)(1)(B), reunification services may be limited to six months for these very young minors. (See *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 [the developmental needs of infants and toddlers justify establishing permanency earlier in proceedings when there is a poor prognosis for reunification].) Moreover, because D.K. is a member of M.K.'s "sibling group," D.K.'s reunification services may be similarly circumscribed pursuant to section 361.5, subdivision (a)(1)(C).[8] Specifically, at a six-month review hearing held in accordance with section 366.21, subdivision (e), reunification services for members of a sibling group may be terminated, and a permanency planning hearing scheduled, if the juvenile court "finds by clear and convincing evidence that the parent failed to participate regularly and make substantive

---

[8] Subdivision (a)(1)(C) of section 361.5 provides as follows: "For the purpose of placing and maintaining a sibling group together in a permanent home should reunification efforts fail, for a child in a sibling group whose members were removed from parental custody at the same time, and in which one member of the sibling group was under three years of age on the date of initial removal from the physical custody of his or her parent or guardian, court-ordered services for some or all of the sibling group may be limited as set forth in subparagraph (B). For the purposes of this paragraph, 'a sibling group' shall mean two or more children who are related to each other as full or half siblings."

progress in a court-ordered treatment plan." Here, the juvenile court made the required finding before terminating mother's reunification services with respect to both M.K. and D.K., and mother does not challenge the propriety of this determination in these proceedings. Rather, mother argues that her reunification services should not have been terminated because: (1) there was a substantial probability that the boys could have been returned to her care by the 12-month review date; (2) the juvenile court should have exercised its discretion to continue services to D.K. and M.K. as a "sibling group" pursuant to section 366.21, subdivision (e); and (3) reasonable services were not provided to her. We address each contention in turn.

## A.    *Substantial Probability of Return*

The presumptive rule for children under the age of three on the date of initial removal (and for members of a "sibling group" which includes such a child) is that reunification services will be provided for a period of six months from the date of disposition. (§ 361.5, subd. (a)(1)(B) & (C).) Pursuant to subdivision (e) of section 366.21, however, even when a "sibling group" like D.K. and M.K. is involved, the juvenile court must still continue reunification services to the 12-month permanency hearing if it concludes that there is a "substantial probability" that members of that sibling group may be returned to a parent "within six months." This statutory language has been interpreted to mean that additional services are warranted if there is a substantial probability of return by the 12-month permanency hearing, which must be held within 12 months from the date the dependent minor entered foster care. (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846; see also § 366.21, subd. (f); rule 5.710(c)(1)(D) [court must continue the case to the 12-month permanency hearing if court finds "a substantial probability that the child may be returned within 6 months or within 12 months of the date the child entered foster care, whichever is sooner"].)

The "date a child enters foster care," is not, as might intuitively be presumed, the date that minor was initially detained. Rather, it is a term of art defined by section 361.49 as follows: "[A] child shall be deemed to have entered foster care on the earlier of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days

13

after the date on which the child was initially removed from the physical custody of his or her parent or guardian." Here, M.K. and D.K. were removed from their parents on August 20, 2013, and the jurisdictional hearing was held on October 23, 2013. Thus, they "entered foster care" for purposes of the statute on October, 19, 2013. Under these circumstances, at the six-month review held on June 24, 2014, continuation of services was only appropriate if there was a substantial probability that the minors could be returned to mother within the next four months—i.e., by October 19, 2014.

A juvenile court making a substantial probability determination with respect to a sibling group at a six-month review is instructed by court rule to consider a number of factors, "along with any other relevant evidence." (Rule 5.710(c)(1)(D)(i).) These express factors include: (1) "[w]hether the parent or legal guardian has consistently and regularly contacted and visited the child;" (2) "[w]hether the parent or legal guardian has made significant progress in resolving the problems that led to the removal of the child"; and (3) "[w]hether the parent or legal guardian has demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional health, and special needs." (Rule 5.710(c)(1)(D)(i)(a)-(c).)

At the conclusion of the June 24, 2014, six-month hearing in this case, the juvenile court found that "given the track record of both parents and their level of participation in this plan," there was no substantial probability that the minors could be returned to their parents in the applicable timeframe for extended services. Mother argues that this finding was erroneous because she had consistently visited with the minors and had made significant progress, especially recently, with respect to her reunification plan. We review the juvenile court's order terminating reunification services for substantial evidence (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028), and see no error under the facts of this case.

It is true that mother partially engaged in services during the reunification period. She visited with the minors on a fairly regular basis, participated in parenting education, and attended some individual therapy. Most recently, as the six-month review date

14

approached, mother also completed a substance abuse assessment and began treatment. And, she engaged consistently with a second therapist to whom she was referred after she was discharged by her first therapist for lack of attendance. On the other side of equation, however, mother refused to complete a psychological evaluation, had an abysmal drug testing record, and continued to associate with individuals involved in illegal activities. Further, despite her parenting education, visitation with the minors did not go well, as mother seemed unable to use the tools she had learned to improve her hands-on parenting skills. Indeed, mother's visitation remained supervised and, according to the social worker, "she can only handle a half-hour with each child and barely." And, although she appeared to be positively engaged with her new therapist, even that therapist opined that that it would take mother a "period of years" to work on her issues. Finally, although she participated in substance abuse treatment, given her failure to disclose the extent of her substance abuse problem, that treatment was not optimally designed to meet her needs.

At bottom, however, the biggest barrier to reunification faced by mother—and the reason that no "substantial probability" finding could credibly be made in this case—is her persistent denial of the problems which led to the removal of her children. As the social worker testified, given that mother remains in "major denial" about her substance abuse, "what change can she really make when we have two special needs children that need a full-time mom that can make multiple appointments per week when mom has demonstrated that she cannot do that and is in denial of why we are here in the first place." Moreover, both parents have refused to admit to domestic violence being an issue in their relationship. And, mother continues to refuse to accept any responsibility for the severe neglect suffered by the minors, maintaining that they were fine and that she met all of their needs prior to their removal by the Department. Thus, while some services were completed by mother in this case, no meaningful progress has been made. Rather,

15

mother has shown herself patently unable to provide for the boys' safety, protection, physical and emotional health, or special needs.[9]

**B.** *Continuation of Services for Sibling Group*

Pursuant to subdivision (e) of section 366.21, the juvenile court, at a six-month review involving a "sibling group," has the discretion to continue reunification services for some or all of the minors. When making this determination, the court—"[f]or the purpose of placing and maintaining a sibling group together in a permanent home"—is directed to consider factors, including but not limited to "whether the sibling group was removed from parental care as a group, the closeness and strength of the sibling bond, the ages of the siblings, the appropriateness of maintaining the sibling group together, the detriment to the child if sibling ties are not maintained, the likelihood of finding a permanent home for the sibling group, whether the sibling group is currently placed together in a preadoptive home or has a concurrent plan goal of legal permanency in the same home, the wishes of each child whose age and physical and emotional condition permits a meaningful response, and the best interests of each child in the sibling group." (366.21, subd. (e); see also rule 5.710(d).)  In the present case, the juvenile court expressly found that it was in the best interests of both minors to terminate reunification services and schedule a permanency planning hearing pursuant to section 366.26.

Mother argues, in contrast, that— given the minors' special needs and her recent attempts at compliance with her reunification plan—the juvenile court should have

---

[9] Although neither party raises the issue, we note that the court and the parties below appear to have been under a misapprehension as to the applicable time limits for additional reunification services in this case.  Presumably measuring from the date of detention rather than from the date the minors entered foster care pursuant to section 361.49, the parties and the court talked in terms of mother having two months of additional reunification services available to her rather than four.  However, given the strength of the evidence in this case that mother was in no way ready to resume custody of the minors and that her situation was unlikely to change materially in the foreseeable future, we find any such error harmless.  (See *In re A.M.* (2008) 164 Cal.App.4th 914, 928 [error harmless if not reasonably probable a more favorable result would have been obtained absent the error]; see also *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1452-1453.)

16

exercised its discretion to extend reunification services for the "sibling group" pursuant to subdivision (e) of section 366.21. Our review of such a discretionary decision, however, is limited. Specifically, "[w]e will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Under this standard and on these facts, we see no abuse of discretion.

First, with respect to the specific factors referenced above, D.K. and M.K. lived together for their whole lives and were removed from their parents at the same time. Further, both boys are quite young and close together in age. Indeed, although D.K. was not a minor under three years of age at the time of his detention so as to qualify on his own for expedited permanency planning under subdivision (a)(1)(B) of section 361.5, he was only six months beyond the three-year limit when he was removed from parental care. In addition, although a concurrent home for both minors had not been identified in March 2014 when the Department filed its initial report in connection with the six-month review, by the time the Department filed its addendum report on June 9, 2014, D.K. and M.K. were placed together in a concurrent home. There, the two young boys share the bond forged by growing up together in an environment of severe neglect, and they both continue to struggle with similar issues. However, both minors have been making significant and consistent progress on these issues while placed together out of their parents' home.

Equally important, the boys show no bond with their mother. To the contrary, as the social worker testified at the six-month review: "The children have consistently been—I have seen the children myself both before and after visits. The children are consistently upset, disoriented, they have trouble sleeping the nights of visits, they have trouble eating. [The visits] are extremely disruptive. They don't want to go to visits in the first place. They say 'No go.' 'No go.' " Indeed, D.K. and M.K. expressed their strong desire not to attend visitation with mother as recently as the week before the six-month review. Further, when they do attend visitation, the minors do not approach mother, do not reciprocate her affection, do not follow her directions, and constantly try

17

to bolt from the room.  And, while they call father " 'Papa,' " they will not call mother " 'mother,' " even when prompted by her to do so.  Rather, they call their caregiver " 'mom' " and run to her after visits.

Finally, as detailed at length above, even if services were extended with respect to one or both of the boys, there is little likelihood that—at any time in the foreseeable future—mother would be in a position to parent these two special needs minors.  Indeed, mother has not even been able to face the reality of their significant delays or admit to the part her neglect played in the creation of those delays.  Under these circumstances, the juvenile court's decision to treat these minors as a unit and expedite their permanency can hardly be deemed arbitrary or absurd.

**C.** *Reasonable Services*

As a final matter, mother asserts that reunification services should have been continued at the six-month review hearing, because reasonable services had not been provided to her.  (See § 366.21, subd. (e) [the court "shall continue" a case to a 12-month permanency hearing if the court finds at the six-month hearing that reasonable services have not been provided].)  The adequacy of a reunification plan and the reasonableness of the reunification efforts made by a child welfare agency must be judged according to the circumstances of each case.  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)  Further, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*); see also *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  Thus, when considering the adequacy of reunification services, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*Misako R., supra*, 2 Cal.App.4th at p. 547; see also *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-1426.)

In particular, to support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems,

18

maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as helping to provide transportation and offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review a reasonable services finding for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) And, under the present facts, we have no difficulty concluding that substantial evidence supports the juvenile court's finding that the services offered or provided to mother were reasonable.

In its dispositional report, the Department identified the problems which led to the loss of custody in this case as the parents' domestic violence issues, mother's substance abuse, father's mental health concerns, and significant parenting deficits. The reunification plan adopted for mother contained a myriad of services designed to remedy these problems. Further, the social worker met consistently with mother and supplied appropriate referrals for service providers on multiple occasions, including new referrals when mother failed to act on a referral or was discharged by an existing provider. In addition, the social worker tried a number of different approaches to promote effective visitation for mother, including therapeutic sessions and arranging for mother to visit with each child separately when it became clear that she had difficulty handling both boys at once. These efforts appear to have been a reasonable response to the situation facing this family.

Mother, however, argues that a single comment made by the social worker at the beginning of the reunification period indicates that the services provided in this case were unreasonable. Specifically, according to mother, the social worker advised her that "the children *would not be returned* to her over the next few months, that she would have to demonstrate over the long term her stability in order to convince the Department." In truth, pursuant to the testimony at the six-month hearing, what the social worker actually told mother is that "if she can demonstrate she has made behavior changes and can be safe, the children *would be returned* to her, but that the Department needs to see long-term change, not a few months" (italics added). In our view, this was an entirely

19

appropriate comment which properly delineated the task ahead for this parent, especially given the significant evidence of pervasive neglect, unacknowledged substance abuse, multi-generational trauma, and domestic violence which ultimately led to the removal of her children.

Mother, in contrast, speculates that if this was the "informed, professional opinion" of mother's social worker, "what more could have and should have this social worker done to meet goals and preference of our law in preserving family relationships?" We find this argument specious. Reunification services are not inadequate merely because they are incapable of effecting immediate change. Indeed, it is manifestly *unreasonable* to expect such services to wipe away years of established dysfunction in a matter of weeks. Once offered, reunification services are simply and only an opportunity, a chance for a struggling parent to choose a different path—one filled with difficult truths, sustained effort, and the forging of new habits over time. Clearly, in the present case, this was not a road that mother was willing to travel.

### III. DISPOSITION

The petition is denied on the merits. (See § 366.26, subd. (l)(1)(C), (4)(B).) Because the permanency planning hearing in these matters is set for October 16, 2014, this opinion is final as to this court immediately. (Rules 8.452(i), 8.490(b)(2)(A).)

                                _____

                                REARDON, ACTING P. J.

We concur:


_____
RIVERA, J.


_____
BOLANOS, J.*

* Judge of the San Francisco City and County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.